April 3, 2015

The Honorable William H. Pauley III
United States District Court
 for the Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

>    **Re:**   ***Federal Home Loan Mortgage Corporation v. Certain Underwriters at Lloyd's London, et al**, Case No 1:14-cv-10153-WHP*
>    Rule 26(f) Report and Proposed Joint Discovery Plan

Dear Judge Pauley:

Pursuant to the Court's Orders dated January 20, 2015 (ECF No. 3) and February 3, 2015 (ECF No. 11) and Federal Rule of Civil Procedure 26(f), on February 19, 2015, each of the parties, through their counsel, conferred regarding the scheduling in this case and submit the following Joint Rule 26(f) Report and Proposed Discovery Plan:

   **1.**   **Brief statement of the nature of the case.**

   **Statement of the Plaintiff**

This action involves a dispute about whether the Defendants (or the "Insurers") owe coverage to Freddie Mac, under primary and excess Financial Institution Bonds (collectively, the "Bonds") that the Insurers sold to Freddie Mac. The loss results from a fraud perpetrated by senior officers and/or employees (the "Conspirators") of Taylor, Bean & Whitaker Mortgage Corp. ("TBW"). TBW was an entity from which Freddie Mac purchased mortgage loans, and also with which Freddie Mac contracted to service loans. The Bonds expressly include coverage for loss to Freddie Mac resulting from servicer theft of loan payments or a servicer simply failing to remit loan payments to Freddie Mac.

The fraud at TBW resulted in the misappropriation of over $2.9 billion in funds from various entities. Several Conspirators have been sentenced to jail. Freddie Mac's loss at issue consists of over $111 million of mortgage loan payments made by Freddie Mac borrowers that one or more Conspirators or others caused TBW to misappropriate or fail to remit to Freddie Mac. Freddie Mac's loss consists of three components: (1) $102.5 million in borrower funds collected by TBW and owed to Freddie Mac that were misappropriated or not paid to Freddie Mac in a scheme referred to here as the "Ocala Scheme"; (2) over $5 million in borrower funds that had been collected by TBW and should have been present in Freddie Mac's TBW custodial accounts prior to TBW filing for bankruptcy, but were not; and (3) approximately $3 million in loan payoff proceeds TBW failed to remit to Freddie Mac.

The Honorable William H. Pauley III
April 3, 2015
Page 2

The Ocala Scheme, the largest component of Freddie Mac's loss, was a shell game. The Conspirators improperly used funds in the possession of Ocala Funding LLC ("Ocala")(a wholly-owned subsidiary of TBW) to make principal & interest ("P&I") payments due to Freddie Mac while misappropriating or causing TBW to fail to remit actual Freddie Mac borrower payments collected by TBW. Third parties provided funds to Ocala to be used for the purchase and sale of mortgage loans, not monthly P&I payments to Freddie Mac. In bankruptcy, Ocala sought from Freddie Mac the return of over $800 million in such funds Ocala asserted TBW improperly transferred to Freddie Mac. Pursuant to a settlement with Ocala (the "Ocala Settlement"), Freddie Mac agreed to return $102.5 million. This $102.5 million corresponds to an equal amount of actual Freddie Mac borrower payments that were stolen by the Conspirators or never remitted to Freddie Mac, for which Insurers owe coverage under the Bonds.

Defendants complain, without merit, about Freddie Mac's level of cooperation. Over the years, the Insurers propounded to Freddie Mac over one hundred overbroad and unreasonably burdensome information and document requests (not including sub-parts), causing Freddie Mac to expend substantial resources to respond. Through in-person meetings, conference calls, and other communications, Freddie Mac provided extensive information and hundreds of thousands of pages of documents to the Insurers about, among other things, the fraud, Freddie Mac's losses, and the nature, status and settlement of Ocala's claim. *See* Section 4 below. Freddie Mac's responses to information and document requests were met with yet more requests from the Insurers. At the same time, the Insurers, upon information and belief, have done little to investigate and/or adjust Freddie Mac's claims and have substantially delayed the claims process.

Freddie Mac will demonstrate that it is entitled to damages for breach of contract and a declaration that the loss it incurred is covered pursuant to the express terms of the Bond. Likewise, Freddie Mac will show that Insurers' defenses, discussed below in the "Statement of the Defendants," are meritless.

## Statement of the Defendants

Freddie Mac seeks coverage under the Bonds for purported losses it allegedly sustained in connection with the failure of TBW, including: (i) $5,038,086 in borrower funds allegedly missing from Freddie Mac's TBW custodial accounts at the time Freddie Mac terminated its relationship with TBW; (ii) $2,599,674.77 from TBW's alleged failure to remit mortgage loan payoff proceeds to Freddie Mac; and (iii) the Ocala Settlement valued at $102.5 million, which resolved third-party tort and clawback claims by Ocala, a wholly-owned subsidiary of TBW, in connection with money TBW paid to Freddie Mac in accordance with the terms of Freddie Mac's Single-Family Seller/Servicer Guide.

Ocala apparently asserted claims against Freddie Mac for fraudulent transfer and constructive fraud, aiding and abetting fraud, and aiding and abetting breach of fiduciary duties, and demanded that it return $805 million that TBW paid to Freddie Mac on mortgages serviced by TBW. The Ocala Settlement is comprised of a $60 million cash payment by Freddie Mac and Freddie Mac's assignment of $42.5 million of its anticipated future recovery from its claim in the TBW bankruptcy proceeding.

The Honorable William H. Pauley III
April 3, 2015
Page 3

In January 2010, Freddie Mac provided notice of a potential loss under the Bonds relating to TBW. During the following five years, Freddie Mac changed its potential claims several times, and submitted an unredacted proof of loss for the Ocala Settlement just over a month before it filed this lawsuit against its Insurers. Upon receipt of Freddie Mac's initial notice, the Insurers timely requested information regarding the circumstances notified by Freddie Mac. On October 5, 2010, Freddie Mac submitted an Initial Proof of Loss (the "Initial POL"), which did not specify a loss for which Freddie Mac sought coverage under the Bonds and provided general information regarding potential losses relating to TBW. Shortly after receiving the Initial POL, the Insurers requested information and documentation regarding the Initial POL and reiterated their prior outstanding requests for information and documentation.

By letter dated April 13, 2012, Freddie Mac provided an "update" regarding its "current understanding of, and bases for, its covered and potentially covered losses and potential losses." On July 17, 2012, Freddie Mac submitted a "Supplemental Updated Proof of Loss" (the "Supplemental POL") in which it sought coverage for the first time for $7,637,760.77 resulting from borrower funds allegedly missing from Freddie Mac's TBW custodial accounts and TBW's alleged failure to remit mortgage loan payoff proceeds to Freddie Mac. In addition, Freddie Mac identified certain loss categories for which it did not have sufficient information to submit a claim under the Bonds, including potential third party liability claims by Ocala. Shortly thereafter, the Insurers requested information regarding the Supplemental POL, and reiterated their prior outstanding requests for information.

On September 16, 2014, more than four years after its initial notice, Freddie Mac submitted a substantially redacted "Third Supplemental Proof of Loss" regarding the Ocala Settlement, which comprises the majority of its current claim (the "Third Supplemental POL"). Two months later, on November 11, 2014, Freddie Mac submitted an unredacted version of the Third Supplemental POL. On December 29, 2014, Freddie Mac filed this lawsuit, before the Insurers were able to complete their investigations and a short time after it had proposed a tolling agreement to the Insurers. On January 5, 2015, the Insurers requested information regarding the Third Supplemental POL and again reiterated their long outstanding requests for information regarding the Ocala Settlement and the prior POLs. Many of the Insurers' requests for information remain outstanding.

Freddie Mac has not met its burden to prove that it sustained a loss covered under Insuring Agreement K or otherwise. For example, Paragraph (A) of Insuring Agreement K requires Freddie Mac to prove that TBW committed dishonest or fraudulent acts with the manifest intent to cause Freddie Mac to sustain a loss. TBW, however, apparently made timely payments to Freddie Mac for the borrower advances it owed under the servicing agreement. Also, Paragraph (B) of Insuring Agreement K requires Freddie Mac to prove its Loss of Money collected or received for Freddie Mac through the failure of TBW to pay to Freddie Mac the Money so collected or received and which was discovered to be due and payable while Insuring Agreement K was in force. Again, TBW apparently made timely payments to Freddie Mac for the amount of borrower advances it owed to Freddie Mac. Freddie Mac's settlement payment to Ocala almost five years later was not through the failure of TBW to pay money it had collected or received and that was discovered to be due and payable while Insuring Agreement K was in force.

Further, a number of exclusions of the Bonds would preclude coverage, including: (i) Exclusion (v), which excludes "indirect or consequential loss of any nature"; (ii) Exclusion (t), which precludes coverage for "damages of any type for which the Insured is legally liable, except compensatory damages but not multiples thereof arising directly from a loss covered under this bond"; (iii) Exclusion (3) applicable to Paragraph (B) of Insuring Agreement K, which excludes coverage for Loss of Money collected or received for the account of Freddie Mac by TBW unless TBW was legally liable to Freddie Mac on account of the loss of such money.

In addition, specific to those Defendants issuing excess coverage (the "Excess Insurers"), no liability will attach under such excess coverage unless and until all applicable retentions and underlying coverage has been exhausted, and it is quite likely that will never be the case. Also, the excess coverage may not follow form, in whole or in part, to the primary coverage, and the Excess Insurers expressly reserve their rights in this regard.

Finally, the Insurers have additional defenses to the claim pursuant to a number of other terms and conditions of the Bonds, including: (i) Section 3, Discovery; (ii) Section 5, Notice/Proof – Legal Proceedings Against Underwriter; (iii) Section 12, Termination or Cancellation; (iv) Section 9, Other Insurance or Indemnity; and (v) Section 7, including the Insurers' cooperation, consent, assignment, subrogation and recovery rights under the Bonds.

**2.     Whether parties will be joined.**

The parties do not anticipate the joinder of additional parties.

**3.     The nature of discovery contemplated by each party, including proposed limitations.**

The parties contemplate conducting discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Courts for the Southern District unless otherwise agreed.

The parties have communicated about bifurcation and disagree as set forth below.

Defendants' Position

Freddie Mac has asserted a claim for attorneys' fees and costs pursuant to Virginia Code § 38.2-209, which allows an insured to recover costs and fees if the court determines that the insurer acted in bad faith. Under Virginia law, a claim for bad faith is not ripe until an insured has established coverage and a judgment against the insurer is a condition precedent to any claim for bad faith. See Tiger Fibers, LLC v. Aspen Specialty Ins. Co., 594 F. Supp.2d 630, 655 (E.D. Va. 2009). Accordingly, the Insurers will seek to stay and bifurcate Freddie Mac's claim under § 38.2-209 unless it prevails on its breach of contract claim. See Seneca Ins. Co. v. Shipping Boxes I, LLC, et al., 30 F. Supp.3d 506, 513 (E.D. Va. 2014).

The Honorable William H. Pauley III
April 3, 2015
Page 5

Plaintiff's Position

Any bifurcation motion brought by Defendants should be rejected.  Bifurcation is a procedural matter and therefore governed by Federal Rule of Civil Procedure 42.  In any event, bifurcation is not appropriate here because significant overlap exists between ordinary claims handling discovery to which Freddie Mac is entitled even without a bad faith claim and any additional bad faith discovery Defendants might have to produce.  Accordingly, bifurcation of discovery will no doubt lead to discovery disputes about what information is discoverable (*i.e.* relevant to coverage) and what potentially is not (*i.e.* relevant only to bad faith).  More, bifurcation would result in a waste of judicial and party resources, requiring many witnesses to be deposed twice.  *See, e.g.*, *Styles v. Liberty Mut. Fire Ins. Co.*, No. 7:06CV00311, 2006 WL 1890104, at *3 (W.D. Va. July 7, 2006) ("The issue of coverage is intimately intertwined with the issue of bad faith. . . . It would be inefficient to bifurcate discovery on issues that parallel each other and thus, the court will allow discovery on both issues to proceed simultaneously."); and *Great Am. Ins. Co. v. GRM Mgmt*, No. 3:14CV295, 2014 WL 6673902, at *11 (E.D. Va. Nov. 24, 2014) (denying bifurcation of discovery between breach of contract and fees for bad faith under Va. § 38.2-209).

**4.    Proposed deadlines to amend pleadings, file motions, and complete discovery.**

Plaintiff and Defendants disagree on the amount of time needed for fact discovery.  Each side's position is set forth below.

Plaintiff's position

Given the amount of information to which Defendants have had access for years, Plaintiff believes, as outlined below, that the parties should be able to complete fact discovery by October 15, 2015 if not before (as a compromise, Plaintiff proposed a fact discovery cutoff of November 15, 2015, but that was rejected by Defendants).

This matter is not new.  Fraud at TBW was uncovered no earlier than August, 2009.  Freddie Mac submitted an Initial Proof of Loss to the Insurers on October 5, 2010 and subsequent updated Proofs of Loss on April 13, 2012, July 12, 2012 and September 16, 2014.  Much information about the fraud at TBW has been available to Defendants through various litigations, including the trial of the main perpetrator, TBW's former chairman and owner Lee Farkas (the transcripts and exhibits to which Plaintiff provided to Defendants).  Additionally, notwithstanding Defendants' assertions below, Plaintiff produced or made available to Defendants hundreds of thousands of pages of documents (including each production Freddie Mac made to third party litigants) and responded to scores of interrogatory style questions.  Defendants refusal to agree to confidentiality agreements or protective orders imposed by third parties precluded, for a time, Freddie Mac from producing certain information obtained from Ocala and TBW.  That issue is now resolved and Freddie Mac produced such documents to Defendants without waiting for formal discovery here to begin.  The parties do not need ten months for discovery, as Defendants assert.

The Honorable William H. Pauley III
April 3, 2015
Page 6

Defendants' Position

Freddie Mac seeks coverage under the Bonds for purported losses "of over $111 million" that it allegedly incurred as a result of a complex $2.9 billion fraud at TBW, which resulted in numerous criminal, regulatory, civil and bankruptcy actions. It argues, however, that given the limited information it selectively provided to the Insurers during their investigations, and as certain information about TBW is publicly available, the Insurers should be able to complete fact discovery within the next six months.

During the past five years, Freddie Mac's potential claim has changed many times and its current claim includes a number of different purported losses. By way of example, the first time Freddie Mac even made a claim that could potentially implicate the second excess insurers, who sit excess of $105 million in retentions and coverage, was September 16, 2014, and this suit was filed a mere few months later. Until that time, Freddie Mac's purported claim was just over $7 million. It has also failed to comply with its obligations under the Bonds to cooperate with the Insurers' investigations and provide information relevant to its claims. As set forth above, the Insurers issued timely requests for information in response to each of the three POLs submitted by Freddie Mac, but much of the information requested by the Insurers was not provided. The Insurers requested information regarding the Ocala Settlement, which comprises most of its current claim, months before Freddie Mac filed the lawsuit, but Freddie Mac failed to provide any of that information until March 2, 2015 when it forwarded a CD that appears to contain some information relating to Ocala.

Further, on July 30, 2010, the Insurers agreed to a confidentiality agreement with Freddie Mac. In the following years, however, Freddie Mac refused to provide information to the Insurers unless they agreed to sign onto protective orders and confidentiality agreements it had entered into with third parties (without the Insurers' knowledge) that did not comply with its confidentiality agreement with the Insurers and would have limited the Insurers' use of relevant information.

In view of the complexity of the underlying circumstances and Freddie Mac's claim, as well as the numerous coverage issues that will be addressed in this litigation, it is clear that this matter will involve a significant amount of both fact and expert discovery. For example, Freddie Mac contends that its purported "loss consists of over $111 million of mortgage loan payments that one of more Conspirators or others caused TBW to misappropriate or fail to remit to Freddie Mac." The Insurers will be entitled to discovery of the alleged misappropriation of payments by TBW, including related documents and the testimony of current and former employees of Freddie Mac as well as TBW, Ocala, Colonial Bank and other third parties. The Insurers are also entitled to discovery relating to criminal, bankruptcy and civil actions involving these and other parties, including an action in which Freddie Mac also seeks coverage under TBW's fidelity bonds for purported losses relating to TBW. The Insurers may be required to compel a number of third party witnesses to testify, including individuals who are currently incarcerated. With respect to their discovery and termination defenses, the Insurers are entitled to discovery regarding when Freddie Mac and/or its conservator, the FHFA, first learned of dishonest or fraudulent conduct at TBW or discovered the loss. For example, it appears that Freddie Mac may have known as early as April 1, 2002 that Fannie Mae had terminated its loan servicing

The Honorable William H. Pauley III
April 3, 2015
Page 7

relationship with TBW based on fraudulent mortgages. Also, in June 2008, an investigative reporter may have advised senior managers of the FHFA's predecessor of fraudulent loan activity at TBW.

Particularly in view of Freddie Mac's failure to cooperate with the Insurers' investigation, the Insurers anticipate that a number of discovery disputes will arise and that they will need sufficient time to compel Freddie Mac and numerous third parties to produce documents and provide testimony. Therefore, the Insurers request at least 10 months for fact discovery and five months for expert discovery.

| EVENT | PLAINTIFF'S PROPOSED DATES | DEFENDANTS' PROPOSED DATES |
|---|---|---|
| Exchange initial disclosures | March 5, 2015 | March 5, 2015 |
| Deadline to amend pleadings without leave of Court | In accordance with Rule 15 of the FRCP | In accordance with Rule 15 of the FRCP |
| Fact discovery deadline | October 15, 2015 | February 15, 2016 |
| Disclosure of initial experts and expert reports (by all parties) | November 15, 2015 | April 15, 2016 |
| Disclosure of rebuttal experts and expert reports | December 15, 2015 | May 15, 2016 |
| Expert discovery deadline | February 1, 2016 | July 15, 2016 |
| Deadline for dispositive motions, including *Daubert* motions. | March 15, 2016 | September 15, 2016 |
| Rule 26(a)(3) Pretrial disclosures and remaining motions in limine | 30 days before trial | 30 days before trial |
| Objections to 26(a)(3) Pretrial disclosures and motions in limine | Within 14 days after pretrial disclosures and motions *in limine* are made | Within 14 days after pretrial disclosures and motions *in limine* are made |
| Final pretrial conference | To be determined | To be determined |
| Trial | To be determined | To be determined |

   5.   **Issues about disclosure or discovery of electronically stored information ("ESI"), including the form or forms in which it should be produced.**

The Parties agree that electronic discovery should be managed so as not to create unnecessary or excessive cost to the litigants. The parties will endeavor to discuss and agree, among other things, upon key word searching to limit the scope of documents that need to be reviewed for production.

The Honorable William H. Pauley III
April 3, 2015
Page 8

**6.    Issues about claims of privilege or protection of trial-preparation materials, including—if the parties agree on a procedure to assert these claims after production—whether to ask the Court to include their agreement in an order.**

The Parties agree to meet and confer on ways to reduce the burden of preparing privilege logs.

**7.    Any other orders that the Court should issue under Rule 26(c) or under Rule 16(b) and (c).**

The parties anticipate moving for a protective order pursuant to Rule 26(c) for the production of documents and information, including documents and information regarding private and confidential consumer information.

**8.    Settlement.**

The parties are contemplating private mediation.

Dated:  April 3, 2015

By: /s/ Matthew J. Schlesinger
Matthew J. Schlesinger
(admitted *pro hac vice*)
Julie L. Hammerman
(admitted *pro hac vice*)
Tara A. Brennan
(admitted *pro hac vice*)
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.  20005
Telephone:  202.414.9200
Facsimile:  202.414.9299
mschlesinger@reedsmith.com

Paul Breene *(New York Bar # 2327070)*
REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, NY  10022
Telephone:  212.521.5400
Facsimile:  212.521.5450
pbreene@reedsmith.com

By: /s/ Edward J. Kirk
Edward J. Kirk, Esq.
Theresa M. Biedermann, Esq.
Clyde & Co US LLP
405 Lexington Avenue
New York, New York  10174
Edward.Kirk@clydeco.us
Theresa.Biedermann@clydeco.us

*Counsel for Certain Underwriters at Lloyd's, London* subscribing to Financial Institution Bond Nos. QA032109(1), QA065309(2) and QA065409(2), *RLI, Axis Reinsurance Company (incorrectly sued as Axis Surplus Insurance Company), Continental, Arch, St. Paul, and Aspen*

By: /s/Melinda B. Margolies
Melinda B. Margolies, Esq.
Arshia Hourizadeh, Esq.
Kaufman Borgeest & Ryan LLP
200 Summit Lake Drive
Valhalla, NY  10595
mmargolies@kbrlaw.com

The Honorable William H. Pauley III
April 3, 2015
Page 9

George Kielman, Esq.
Managing Associate General Counsel
Scott L. Walker, Esq.
Associate General Counsel
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive, MS 202
McLean, VA 221 02
george_kielman@freddiemac.com
scott_walker@freddiemac.com

*Counsel for Plaintiff*

By: /s/ Paul C. Fonseca
Martin J. Flannery, Esq.
Paul C. Fonseca, Esq.
Pattison & Flannery
427 Bedford Road, Suite 180
Pleasantville, NY  10570
mjf@patflan.com
pcf@patflan.com

*Counsel for Berkley Regional Insurance Company*

ahourizadeh@kbrlaw.com

*Counsel for Houston Casualty Company (sued incorrectly herein as U.S. Specialty Insurance Company)*

By: /s/ Kevin Mattessich
Kevin Mattessich, Esq.
Robert MacAneney, Esq.
Kaufman Dolowich & Voluck, LLP
60 Broad St., 36th Floor
New York, New York  10004
kmattessich@kdvlaw.com
rmacaneney@kdvlaw.com

Andrew R. Simmonds, Esq.
David Bergenfeld, Esq.
D'Amato & Lynch, LLP
Two World Financial Center
New York, New York  10281
ASimmonds@damato-lynch.com
DBergenfeld@damato-lynch.com

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.*